**NORTHFLEET CORPORATION**

v.

**CONSOLIDATED RAIL CORP.**

Civ. A. No. 83–2992.

United States District Court,
E.D. Pennsylvania.

Sept. 20, 1985.

---

## MEMORANDUM

### LOUIS H. POLLAK, District Judge.

The motion for provisional pre-judgment protection of defendant Consolidated Rail Corporation ("Conrail") presents another in a series of pre-trial disputes that have characterized this diversity case from its beginning. The case itself arises out of a disagreement between Northfleet Corporation ("Northfleet") and Conrail over a lease. As of December 1, 1967, Northfleet allegedly leased to the Pennsylvania Railroad Company fifty (50) diesel locomotives. Conrail succeeded to the rights of the lessee under that lease on April 1, 1976.

On June 23, 1983, Northfleet filed a complaint that alleged various breaches of the lease agreement by Conrail. Among them are Conrail's alleged failures to comply with provisions of the lease concerning casualty losses to the locomotives, to maintain the locomotives in good repair, and to deliv-er them to Northfleet in accordance with the lease upon its termination. *See* Complaint 8–19. Conrail denied Northfleet's claims and asserted a counterclaim seeking storage charges for the locomotives because they were left with Conrail beyond the three-month grace period stipulated in the lease. *See* Answer, at 6–7.

This court has so far resolved the numerous disputes between the parties, particularly those concerning discovery and demands for sanctions. The action triggering this latest dispute is a sale by Northfleet of eighteen (18) of the locomotives in Conrail's possession. Northfleet sold these locomotives to Naporano Iron Metal Company, but Conrail refused to release them unless the proceeds of the sale were put into an escrow account or Northfleet posted a bond. By a telephone conference on April 10, 1985, this court temporarily resolved the dispute with Northfleet agreeing not to distribute the sale proceeds until this motion was decided and with Conrail agreeing to release the locomotives.

The substance of Conrail's present motion can be summarized as follows. Conrail asserts that, if Northfleet is allowed to distribute the proceeds from the sale of the locomotives, Conrail may be unable to collect on the counterclaim should it prevail in the suit. *See* Memorandum of Law in support of Consolidated Rail Corporation's Motion for Provisional Pre-judgment Protection, at 2. Conrail's fear of being unable to collect a possible judgment is based upon the alleged fact that Northfleet is no more than a "shell" corporation whose only assets are the locomotives and which is controlled by two corporations not parties to the suit, Amvest Leasing Corporation and Radnor Associates. *See id.* at 3. Conrail adds that the parties came to an agreement to escrow proceeds from the sale of two other locomotives. It does not understand why a similar escrow arrangement or the posting of a bond would not satisfy Northfleet with respect to the eighteen locomotives. *See id.* at 16–17.

Northfleet, in response, points out that other locomotives involved in the lease

have been sold by it without the proceeds being put in escrow. *See* Memorandum of Law in opposition to Consolidated Rail Corporation's Motion for Provisional Prejudgment Protection, at 15. Because Northfleet feels that Conrail's motion is completely without merit, it asks the court to impose sanctions upon Conrail pursuant to the court's power under Federal Rule of Civil Procedure 11.

Conrail has not been entirely precise in identifying the particular federal or state legal principle—and whether it is statutory, or grounded on a rule of procedure, or part of the arsenal of inherent judicial power—it invokes in asking this court for pre-judgment protection. Conrail's broad-ranging argument does, however, touch on at least three issues—warehouseman's lien, Federal Rule of Civil Procedure 64, and equity powers—which arguably have a bearing on the proper resolution of Conrail's motion.

### 1. *Warehouseman's Lien*

In its memorandum, Conrail argues at length that it has a warehouseman's lien on the locomotives under New York law. *See* Memorandum, at 5–9. It is unclear what Conrail hopes to accomplish by this argument. Either 1) it is meant to establish a new claim to the locomotives, which in turn entitles it to the remedy it demands, or 2) it is intended to reassert its counterclaim, which might justify the pre-judgment remedies sought.

If by its discussion of a warehouseman's lien, Conrail is attempting to establish a new claim to the locomotives, it is not readily apparent what differentiates this alleged lien from the counterclaim Conrail has already asserted. If there is no difference between the lien and the counterclaim, it does not seem appropriate in the context of a motion for pre-judgment protection to decide the substance of Conrail's counterclaim. For to accept Conrail's argument that it has a valid warehouseman's lien would in effect be to grant its counterclaim, which in turn would appear to constitute an implicit determination of the merits of Northfleet's claims.

On the other hand, Conrail's discussion of the warehouseman's lien may be understood as a reassertion of its counterclaim and thus a justification for a pre-judgment remedy. Thus, the question becomes whether one with a colorable claim to possess the status of warehouseman is entitled to any special pre-judgment protection.

Warehouseman's law has been codified in Article 7 of the Uniform Commercial Code, which both Pennsylvania and New York, the site of the "warehousing" of the locomotives, have adopted.[1] This statute defines "warehouseman" as "a person engaged in the business of storing goods for hire." N.Y.Uniform Commercial Code 7–102(1)(h) (McKinney 1964). Nothing in the statute or its commentary requires this to be the person's sole business or describes the amount of business an individual must be engaged in to achieve the status of warehouseman. Another crucial term in the Code is "warehouse receipt," which is defined as a "receipt issued by a person engaged in the business of storing goods for hire." N.Y.Uniform Commercial Code 1–201(45) (McKinney 1964). Such a receipt "need not be in any particular form." N.Y. Uniform Commercial Code 7–202(1) (McKinney 1964). Finally, if one is a warehouseman and possesses goods for which a warehouse receipt has been issued, one has a lien against the bailor for such expenses as storage charges. N.Y.Uniform Commercial Code 7–209(1) (McKinney 1964). This lien is lost if the warehouseman "voluntarily delivers" or "unjustifiably refuses to deliver" the goods. N.Y.Uniform Commercial Code 7–209(4) (McKinney 1964).

---

1. Conrail argues that New York Uniform Commercial Code law should apply because the locomotives in dispute were "stored" in New York and because the lease had a choice of law provision. It is unclear whether Northfleet contests this assertion. Given the substantial identity of the New York and Pennsylvania Code provisions on warehousemen, this Memorandum will refer to the New York Code and will not purport to dispose of the larger issue—not systematically addressed by the parties—of whether a Pennsylvania court would look to New York's or to Pennsylvania's Code (and supporting case law) if the provisions differed.

Whether or not Conrail *is* a warehouseman, it is evident that, for the limited purposes of this motion, Conrail has at least a colorable claim to warehouseman status. In its memorandum, Conrail has made a showing that it is in the business of storing goods for hire. *See* Memorandum, at 6. Moreover, Conrail's letter to Northfleet announcing the storage charges Conrail was assessing for keeping the locomotives could, arguably, be viewed as a warehouseman's receipt within the meaning of the Code definition. If Conrail is a warehouseman and has issued a warehouseman's receipt, then by the terms of the Code it has a warehouseman's lien against Northfleet for expenses related to the storage of the locomotives. The question now becomes—and this is the heart of our inquiry—whether this colorable lien creates any right to pre-judgment relief for the lienor.

■ Conrail has pointed to no Code provision that entitles the holder of a warehouseman's lien to pre-judgment protection or to treatment different from that accorded to the holder of any other lien. Contrary to what Northfleet asserts and what Conrail may fear, Conrail will not have lost its putative lien if, as is the case here, it has been compelled to relinquish possession of the locomotives pursuant to a court order. *See* N.Y.Uniform Commercial Code 7–209 practice commentary (McKinney 1964). Accordingly, Conrail's colorable claim of warehouseman status does not entitle it to the pre-judgment relief sought.

### 2. *Rule 64*

The major demand for relief by Conrail, however, takes the form of a request for pre-judgment protection under the authority granted to the court by Federal Rule 64.

Conrail states that pursuant to this rule and to the equitable doctrine of *quia timet,* or quiet title, this court has the power to set up an escrow account for the sale proceeds or to require Northfleet to post a bond if it intends to distribute these proceeds.

■ As Conrail recognizes, the Rule 64 pre-judgment remedies available to the court are those "available under the circumstances and in the manner provided by the law of the state in which the district court is held ..." Fed.R.Civ.P. 64. In this matter, therefore, this court must follow Pennsylvania law. Quiet title does exist as an action in Pennsylvania, *see* Pa.R.Civ.P. 1061, but Conrail points to *no* Pennsylvania case where it has been used outside the context of quieting title to real property. Thus, given the clear directive of Rule 64, the quiet title doctrine does not offer significant grounding for the relief Conrail requests.

### 3. *Equitable powers of the court*

■ In its reply memorandum, Conrail suggests that this court might have "an independent grant of jurisdiction to preserve assets *pendente lite.*" *See* Reply Memorandum, at 6. Conrail has not pointed us to any federal or Pennsylvania cases in which a court, acting under its general equity powers, has required a party to deposit proceeds from a sale into an escrow account or to post a bond in order to be able to distribute sale proceeds.[2]

### Conclusion

■ For the foregoing reasons, Conrail's motion for pre-judgment relief will be denied.[3]

---

**2.** In this context Conrail cites a recent Third Circuit case upholding a lower court's preliminary injunction that froze the assets of an employer to prevent their dissipation. *See* Reply Memorandum, at 5–6 (citing *Nursing Home & Hospital Union No. 434 v. Sky Vue Terrace, Inc.,* 759 F.2d 1094 (3d Cir.1985)). However, that case dealt with the issuance of an injunction, a procedure governed by Rule 65 and a form of relief not sought by Conrail in this motion.

**3.** Northfleet has moved this court to impose sanctions upon Conrail pursuant to Federal Rule 11. Northfleet alleges that Conrail filed the motion for pre-judgment protection simply to harass Northfleet and to prevent it from selling the locomotives. Response at 16. Because Conrail's motion does not appear to have been interposed for such improper purposes, Northfleet's motion for sanctions will also be denied.